QUAN TOON JUNG v. BONHAM, Dist.
Director of Immigration, etc.

No. 9700.

Circuit Court of Appeals, Ninth Circuit.

May 19, 1941.

916

Fred H. Lysons, of Seattle, Wash. (A. W. Richter, of Milwaukee, Wis., of counsel), for appellant.

J. Charles Dennis, U. S. Atty., and Gerald Shucklin, Asst. U. S. Atty., both of Seattle, Wash., and Frank Hale, Asst. U. S. Atty., of Tacoma, Wash. (J. P. Sanderson, U. S. Immigration and Naturalization Service, of Seattle, Wash., on the brief), for appellee.

Before WILBUR, GARRECHT, and HEALY, Circuit Judges.

HEALY, Circuit Judge.

Appellant, a Chinese boy seventeen years of age, was excluded from entry into the United States at the port of Seattle. He sought release on habeas corpus, asserting that the exclusion order was arbitrary and capricious, and from the denial of the relief prayed for he appeals.

Appellant claims the right to enter as the son of Quan Siew, a native-born citizen of the United States. In October, 1938, Quan Siew filed with the immigration service at Saint Paul an affidavit for predetermination of his status as a citizen in anticipation of the coming to this country of appellant, his alleged son. At the same time and for the same purpose he presented himself to the authorities there and submitted to interrogation. Upon receipt of his affidavit and deposition at Seattle, the commissioner at the latter place endorsed on the affidavit the notation: "American citizenship of affiant conceded this date on the basis of proof thereof submitted."

In August, 1939, appellant arrived at Seattle and was examined before a board of special inquiry composed of Inspector Matterson, as chairman, and two others. He was questioned closely and at length concerning his relationship with Quan Siew; and as is customary in such cases the examination covered in great detail the circumstances of his life in China, the physical aspects of his home, village and neighborhood, and particulars in respect of the various members of his family as far back as his grandparents. His deposition was then forwarded to the examining inspector at Saint Paul with the request that full and complete answers be obtained from the alleged father, Quan Siew, covering all matters of which a father should have knowledge. Accordingly Quan Siew was subjected to a rigid examination by the Saint Paul inspector. Thereafter appellant was again interrogated by the Seattle board and at the conclusion of the hearing the chairman moved immediately that the applicant be rejected, the other two board members concurring.

It will be observed that the sole issue before the board was whether the applicant was a son of Quan Siew. A summary of the case by the chairman opens with the following statement: "The native born status of applicant's alleged father, Quan Siew, was established by fraud and misrepresentation, as will be seen from examining his San Francisco File, which is an exhibit in this case, and the Chairman in the case of applicant's alleged brother, Quan Toon Soon, who applied for admis-

sion at this port on October 18, 1932, and was refused admission on Nov. 10, 1932, his appeal dismissed by the Secretary of Labor on appeal on Jan. 10, 1933, and a Writ of Habeas Corpus sued out in his behalf in the U. S. District Court in this District, and the writ dismissed and Quan Toon Soon deported to China, in whose Summary, pages 33 to 31, contain a resume of the citizenship status of Quan Siew. It is apparent that at the time Quan Siew's appeal was sustained by the Central Office in Dec. 8, 1915, they did not have before them the file of Leong Sing, which was later incorporated in Quan Siew's San Francisco file. However, they did have the complete record on June 20, 1921, when this office was directed to issue a citizen's return certificate to Quan Siew. The native born status of Quan Siew is therefore conceded at this time."

Later on in the board's opinion, without explanatory comment, appears the remark that applicant "is well coached"; and at the end of the summary he is characterized as "a fraud and an imposter." In such inauspicious mood had the board proceeded to perform its task of weighing the evidence of paternity.

The situation presented by the petition is an unusual one and a rather full understanding of the background is essential to a decision. It appears from the files of this and related cases that for a quarter of a century certain of the immigration authorities on the Pacific coast have been obsessed by the belief that appellant's alleged father is a foreign-born imposter masquerading as a citizen. These officials have endowed Quan Siew with a dual personality, saddling him with an alias and attributing to this itinerant laundry worker an aptitude for dark ways and vain tricks which nothing in the files of the service would seem to justify.

Quan Siew first appears in the immigration records in 1914, when being about to pay a visit to China, he filed at San Francisco an affidavit, with photograph attached, stating that he was a native-born citizen and was making the showing to facilitate his landing on return. A year later he came back from China and on examination before the local board presented the testimony of himself and two witnesses to establish his nativity. The proof indicated that he had been born in San Francisco in June, 1886, and had lived there since. He had, he said, married during his stay in China, gave the board the name of his wife, and stated in response to a query that she was an expectant mother. The board ordered his exclusion, but on appeal the Commissioner-General, finding his showing of nativity to be "altogether probable", reversed the ruling. The requisite identification certificate was thereupon issued.

About three months prior to Quan Siew's departure for China in 1914 a Chinese giving his name as Leong Sing, his age as 45, his occupation as a merchant, and his place of birth as China, applied at San Francisco for investigation of his claimed status as a lawfully domiciled merchant, stating his purpose of making a temporary visit abroad. After an inquiry during which Leong Sing was personally questioned his application was disapproved and nothing further seems to have been heard of him. In 1917, upon comparison by the local immigration authorities of the photographs of Leong Sing and Quan Siew as contained in the above records, it was thought that the two were one and the same person; and a warrant for the arrest of Quan Siew, alias Leong Sing, was issued on the ground of his having secured admission in 1915 by means of false and misleading statements. Later, as will appear, the Bureau at Washington rejected this slender evidence of identity; and from our own examination of the extensive record we entertain little doubt the Bureau was right in doing so. But this notion of the identity of the young laborer Quan Siew with the middle-aged merchant Leong Sing runs like a somber thread through all the after relations of this Oriental with the local authorities of the service. It was of important if not controlling influence in the exclusion in 1932 of his alleged oldest son; and we are persuaded that it was responsible for the exclusion of appellant. Whenever questioned on the matter Quan Siew has denied all knowledge of the merchant Leong Sing, denied that he ever was or claimed to be that person and denied that the photograph of Leong Sing is a likeness of himself; but, far from being shaken by these denials, the local authorities have merely taken them as yet further evidence of the man's incorrigible duplicity.

Quan Siew was not apprehended, but there is no ground for believing that he evaded arrest. He seems to have gone about his affairs in ignorance of the charge and of the fact that he was hunted.

Glimpses of him are discernible through the years. Later inquiry disclosed that during the World War he had registered for the draft at Madison, Wisconsin, and was inducted into the service. In 1919 he made his presence known to the immigration service in Chicago, and in 1921 he filed with the inspector at Norfolk, Virginia, a statement to. the effect that he had lost the certificate issued him at the port of San Francisco, and desired a duplicate. It appears from his testimony taken in connection with the request that he had for several years been employed in a laundry at Madison and had more recently been engaged in similar work at Norfolk. Questioned on the subject, he told of his wife in China and of his boy, Quan Sang or Soon, aged 6. He stated also that he was about to make a trip to China via Seattle and desired preinvestigation of his status as American-born. The Seattle commissioner, to whom the papers were referred, denied his application for a citizen's return certificate on the ground that he was in reality the merchant Leong Sing, born in China. It was declared that he had "succeeded in evading arrest" on the warrant mentioned "until after the statute of limitations had run on the particular charge". On the appeal which ensued the entire record was before the Bureau and was strongly urged in support of the Seattle ruling; but the Commissioner-General rejected the holding of the local commissioner and directed the issuance of a certificate to Quan Siew as a departing citizen.

More than three years later, in 1924, Quan Siew returned to the United States. The landing sheet made out at the time of his arrival indicates that Quan Siew claimed three sons born during the years just spent in China. More will be said later of this landing sheet. Quan Siew has since made two visits to China, one in 1926, when his stay covered a period of about fourteen months, and the other in 1930, at which time he remained a little more than two years. On the first of these later visits he claimed to have remarried; his first wife, appellant's mother, having died early in 1926. As a result of the visit of that year Quan Siew claimed that his second wife had borne him a son, and upon his return from the final trip in 1932 he told of a daughter born during that visit.

On his last return in 1932 he brought with him Quan Toon Soon, claimed to be the son born after Quan Siew's first visit to China in 1915. The boy was excluded from entry by the Seattle board and his deportation ordered. In the summary of its findings the board gave renewed credence to the old charge that Quan Siew had hid himself to evade arrest; and predicating its assertions on the assumed identity of Quan Siew with Leong Sing, the board observed that "no doubt Quan Siew's claim to American nativity is rankly fraudulent"; that his "claim to having been born in this country is clearly an absolute fabrication"; and that in fact Quan Siew himself "has sworn positively that he was born in China". It is these spurious "findings" that the board of inquiry in the present case refers to and in effect adopts as its own. And largely on the basis of these confessedly indefensible assertions the board in 1932 ordered Quan Toon Soon's deportation.[1]

The case of Quan Toon Soon is water over the dam, and we make no further comment concerning it. We mention it here only as illustrative of the confirmed distemper of the Seattle board. Obviously, if Quan Siew is the Chinese-born imposter that these officials persist in declaring him to be, no child of his is entitled to enter America as a citizen; and there the inquiry should end. And it seems equally obvious that by no feat of intellectual sleight-of-hand can the man be thought at once a native of America and an alien Chinese. It was officially conceded in the case before us that he was born in this country; and the concession was a necessary one in the light of the factual rulings of the Bureau. The concession cannot mean less than that he had satisfactorily met the burden of proving his nativity by credible evidence. To make the concession of citizenship with tongue in cheek, as was done here, is but to cloak in fair words the withdrawal from the citizen of rights guaranteed by the laws of his country.

---

[1] In transmitting the papers for review in that case the commissioner at Seattle expressed the opinion that the discrepancies in the testimony were not very material except for the discrepancy between the 1924 landing certificate and the other evidence. He said the board of inquiry was "undoubtedly in error in holding that the father is not an American citizen", and that, if sustained at all, the board would have to be sustained because of lack of sufficient showing of paternity.

We turn now to the action taken by the board of review on appeal in this case. That board recommended a dismissal of the appeal on the ground that the relationship of the applicant to Quan Siew had not been satisfactorily established. In commenting on the conduct of the hearing, the reviewing board states: "It appears to be a fact that although the Board of Special Inquiry conceded the citizenship of this applicant's alleged father so that the only question at issue in the case was the relationship of the applicant to him, yet in the 'summary' there appears the statement 'The native born status of applicant's alleged father, Quan Siew, was established by fraud and misrepresentation', and as to the character of the testimony the statement is made in this 'summary' that 'Applicant is well coached on testimony regarding his alleged father's family and the home village'. There appears to have been no warrant or justification whatever for the setting down of these statements in this 'summary'. However, it is to be noted that this 'summary' formed no part whatever of the hearing and, indeed, was written apparently after the action by the Board of Special Inquiry had been taken, and was written, as its title indicates, as the summary not by the Board of Special Inquiry, the lawfully constituted body authorized to conduct the hearing, but as the 'summary' by the chairman acting as an individual after the official action of the Board of Special Inquiry had been concluded."

We regret our inability to accept this view of the matter. We think it inadmissible to suppose that the summary reflects merely the state of mind of an individual. Doubtless the members conferred during the progress of the inquiry and understood each other well enough. The summary is in form and content a statement of the findings of the board itself. It is signed by the chairman as such, is attested by a second member, and forms an integral part of the official record of the proceeding.

Moreover, the statute, 8 U.S.C.A. § 153, requires that boards of special inquiry shall consist of three members—not two—designated by the department as qualified to serve. Its decisions adverse to admission in exclusion cases are by the statute made final, subject only to review by the Secretary of Labor. It is the trial court of the immigration service in exclusion cases; and often in such cases its excluding order is tantamount to a sentence of death. It is indeed a tribunal clothed with a serious not to say an awful responsibility.

The incurable vice of the trial was that, by its a priori assumption that Quan Siew had perpetrated a gross fraud on the government, the board of inquiry disabled itself from giving to the testimony of this essential witness that measure of consideration to which in law as well as in common fairness it was entitled. It matters not that the board may have chosen to disbelieve Quan Siew on other grounds, for their minds were conditioned beforehand to discredit whatever the declared imposter might say. Indeed, it can hardly be thought that irrefragable proof of the relationship would have sufficed to satisfy a board so fatally bent on exclusion as a public duty. Decision in such circumstances degenerates into a mere process of rationalizing; and such we believe was the process here.

■ Aside from the single item of the 1924 landing certificate, the showing of paternity was persuasive. On the occasion of Quan Siew's various other landings and departures the information given by him concerning the appellant and his other children squares with the present testimony. There were slight discrepancies, of course, as in the phonetic spelling of names, but these were not significant and are readily explainable. The testimony of the applicant and of the alleged father in support of the relationship is of such character as to compel belief. On the great mass of intimate details testified to their accounts are confessedly in substantial agreement. There is no evidence of coaching, as the board of review concedes; and indeed coaching sufficient to produce the result observed here would have been virtually impossible. Quan Siew and the boy had not seen each other in seven years, and at the time of the inquiry they were separated by a distance of a thousand miles. If it were permissible to judge from their photographs it would be seen that the two so closely resemble each other as to further substantiate the belief that they are father and son.

It is principally on the basis of the 1924 landing sheet heretofore mentioned that the board of review upheld the Seattle ruling. We think, however, that this document is entitled to little if any weight. We now consider it.

The landing sheet was the routine work of an inspector on shipboard. The blanks

contained in it are filled out by the officer roughly in pencil and the document is all but illegible, bearing on its face evidence of haste and incompleteness. The number of children is stated as four, but only three names are set down. The names and birthdates do not appear to correspond with information given at other times, and of this circumstance much has been made. On one margin of the sheet is the notation "difficult to give dates", and on the other appears the penciled word "questionable". It is impossible to know with certainty whether the difficulty lay with the Chinese or with the inspector, since Quan Siew does not readily speak or understand English and it is not known whether an interpreter was used in this instance or what questions were put. With characteristic eagerness to give an unfavorable quirk to every circumstance involving Quan Siew, the board of inquiry construed the notations as though the inspector meant to imply that it was questionable whether Quan Siew had any sons. But it is equally reasonable to believe that the notations were meant to indicate doubt whether the inspector had accurately understood the information attempted to be imparted. We think the document is worthless.

■■ Given a fair inquiry in these cases, the courts are bound to accept the determination of the administrative authorities on questions of fact and of the credibility of witnesses. But the trial in this instance was had in such an atmosphere of predetermined discontent as to strip the inquiry of the essentials of due process. On the merits, as has been said, the showing of

paternity was ample; and we believe the proof in this respect would have been accepted by the members of a tribunal whose minds were fairly open to persuasion. We hold that the exclusion order was a mere nullity and it is set aside.

The order below is reversed with directions to enter a judgment granting the petition and discharging appellant from custody.

WILBUR, Circuit Judge (concurring).

I concur. Petitioner having applied for entry at the port of Seattle, Washington, in August 1939, was rejected by the Board of Special Inquiry upon the first hearing, August 28, 1939, and was again rejected on December 13, 1939 after reopening the case to receive and consider additional evidence offered by the applicant. Each time he appealed and the appeals were dismissed by the Secretary of Labor upon recommendation of the Board of Review. The second hearing before the Board of Special Inquiry after the dismissal of the appeal from its first order of exclusion, occurred by reason of the application of the petitioner for a reopening of his case in order to hear the testimony of another witness in support of his application. This witness, Kong Tin, testified that he had visited the petitioner's family in China and found petitioner in the home of his alleged father and mother. The second appeal having been taken, the Board of Review again recommended the dismissal of the appeal, which was done.

The Board of Review, in its opinion of November 6, 1939, which is appended in the footnote[1] held that it was improper for the

---

[1] Quan Siew, alleged father of the applicant, who was last in China between September, 1930, and October, 1932, has appeared as the only witness to testify on applicant's behalf.

The record shows that the alleged father of the applicant claimed in February, 1921, to have one son, for whom he gave the name of Quan Sang and stated his age to be six. When returning from the trip to China on which he departed shortly after recording that claim the alleged father was recorded on a form statement dated September 7, 1924, as stating that he had four sons, evidently meaning that in addition to the one son he had previously claimed three sons had been born while he was in China on the trip from which he was then returning. The names and birth dates of these three sons he gave as follows: Quan Gun, born May 22, 1921; Quan Gee, born

June 14, 1923; and Quan Lai, born August 15, 1924.

This applicant, Quan Toon Jung, is now claimed to have been born on May 27, 1922. In that September, 1924, statement there appears no claim by the alleged father to have had a son of the name or of a name closely similar to that given by and for this applicant and no son born on the birth date now given by and for this applicant. In September, 1930, when an applicant for a return certificate at Seattle, the alleged father gave the names and birth dates of his four claimed sons as Quan Toon Soon, born December 21, 1915; Quan Toon Heung, born May 27, 1922; Quan Toon Jon, born July 14, 1923; and Quan Toon Ham, born August 15, 1924.

In November, 1932, Quan Toon Soon, the older alleged brother of this present applicant, applied for admission as a son

Board of Inquiry to use the record before it concerning the application of one Leong Sing for a return certificate as a merchant made August 12, 1914, and also that it was improper to state in its opinion that the petitioner was "well-coached". Notwithstanding the rejection of these considerations the first appeal to the Board of Review was dismissed because of discrepancies in the testimony of the alleged father as to the names and dates of birth of his four sons.

After the reopening of the case and the second hearing by the Special Board, the applicant's rejection was again recommended by it. Upon the appeal from his second rejection the Board of Review again sustained its conclusion and recommended the dismissal of the appeal. Consequently, the second appeal was dismissed. This opinion of the Board of Review is shown in the footnote.[2]

---

of Quan Siew, the applicant's alleged father. At that time the names and birth dates of the alleged father's claimed sons by his first wife were given as Quan Toon Soon, born December 21, 1915; Quan Toon Jung, born June 25, 1922; Quan Toon Hein, born June 14, 1923; and Quan Toon Heung, born June 15, 1924. The applicant Quan Toon Soon was excluded by a vote of the Board of Special Inquiry at Seattle and when his case came before the Department on appeal the appeal was dismissed (55813/733) principally upon the finding that "It is not to be believed that a father testifying truthfully regarding his children would so contradict himself at various times as to their names, ages and order of birth, and this feature would seem to discredit him as a witness regarding any claim of family relationship that he might make". Following the dismissal of that appeal a petition for a writ of habeas corpus was sued out in the District Court of the United States for the Western District of Washington, Northern Division, and while no opinion appears to have been spoken by the court, its action apparently indicated that the order denying that applicant's admission was not arbitrary or capricious and that there had been no unfairness in the hearing. He was, therefore, returned to China in April, 1933.

While the present testimony is free from discrepancies and is thus corroborative of the applicant's claim, in the opinion of the Board of Review no evidence has been presented which is sufficiently strong or persuasive of the bona fides of the case to overcome the very serious adverse evidence in the inconsistent and conflicting prior-record statements which this applicant's alleged father has made in the description of his claimed family and which were thus found to constitute a sufficient reason for the adverse finding in the case of applicant's alleged older brother who applied for admission in 1932 and was returned to China in 1933.

It is unfortunately necessary to comment upon the statements contained in the "summary by chairman on rejection" in this case which appear to have afforded to the attorney some occasion for his charging an attitude of unfairness and prejudice. It appears to be a fact that although the Board of Special Inquiry conceded the citizenship of this applicant's alleged father so that the only question at issue in the case was the relationship of the applicant to him, yet in the "summary" there appears the statement "The native born status of applicant's alleged father, Quan Siew, was established by fraud and misrepresentation", and as to the character of the testimony the statement is made in this "summary" that "Applicant is well coached on testimony regarding his alleged father's family and the home village". There appears to have been no warrant or justification whatever for the setting down of these statements in this "summary". However, it is to be noted that this "summary" formed no part whatever of the hearing and, indeed, was written apparently after the action by the Board of Special Inquiry had been taken and was written, as its title indicates, as the summary not by the Board of Special Inquiry, the lawfully constituted body authorized to conduct the hearing, but as the "summary" by the chairman acting as an individual after the official action of the Board of Special Inquiry had been concluded. A review of the hearing itself gives no ground whatever for a charge of unfairness and in the circumstances it is not believed that these unfortunate statements made by the person who had officiated as the chairman of the Board of Special Inquiry after the conclusion of the hearing can properly be taken as grounding a charge of unfairness in the hearing.

In view of the adverse evidence in the contradictory prior-record statements of this applicant's alleged father, it is not believed that the applicant's claim to be his son has satisfactorily or reasonably been established.

It is recommended that the appeal be dismissed.

[2] The record shows that for the reasons stated in memorandum of November 6, 1939, the appeal of this appli-

It will be noted that the conclusion of the Board of Review is based in part upon the memorandum of the names and dates of birth of the alleged brothers of the appellant made by an inspector at the time of the reentry of petitioner's alleged father in 1924, after a three-year stay in China. I agree with my associates that this memorandum was unworthy of consideration as evidence in the case because of the defects apparent on its face and its certified deficiencies stated in the main opinion.

Eliminating the memorandum from consideration we find that the ultimate cause for rejection of the applicant is that notwithstanding the consistency of the evidence in other respects the alleged father, in September, 1930, gave the Immigration Authorities the name of his second son as Quan Toon Heung, and in 1932 gave them the name of his second son as Quan Toon Jung. The statements of the petitioner's alleged father throughout have been consistent as to the number of his sons, and substantially the same, when properly understood, as to the dates of their births, but the rejection of applicant was based upon the difference in spelling of the third name of the second son; that is to say, he was given the names of Jung and Heung. The petitioner asserts that the spelling of these names in English was an attempt of the interpreter to indicate an appropriate spelling for the same sounds in Chinese, and whether or not this is true this variation is a very slender thread upon which to base the conclusion that the alleged father had no such son at all and to exclude the applicant who has otherwise established satisfactorily his claim as an American citizen.

The right of the immigration authorities to consider and review previous actions bearing upon the admissibility of the applicant for admission has been considered by the Supreme Court and also by this court. In re Tang Tun, 9 Cir., 168 F. 488; Tang Tun v. Edsell, 223 U.S. 673, 680, 681, 32

cant from denial of admission at Seattle was dismissed, and that on November 16th a stay of deportation was directed and authorization given for the reopening of the case to hear a proposed additional witness.

In his appearance before the Board of Review and in his supplementary brief; submitted since the case was reopened and, after hearing the proposed additional witness, the Board of Special Inquiry at Seattle again voted to exclude the applicant; the attorney has devoted the first and principal part of his argument to an attack upon the previous action of the Department in dismissing the appeal from the original excluding decision by the Board of Special Inquiry.

It is not believed that the attorney has set forth any substantial reason to support his contention that the previous action of the Department was erroneous in its finding that the alleged father's failure, in 1924, upon return from his visit to China, in the midst of which this applicant is now claimed to have been born, to claim a son of name and birth date corresponding with those now given by and for this applicant, constitutes very seriously, if not indeed fatally, adverse evidence. The attorney has, however, called attention to a statement in the Board of Review memorandum of November 6, 1939, in which two comparatively minor and immaterial mistakes were inadvertently made with reference to the testimony given by this applicant's alleged father in November, 1932. This memorandum statement is that the name and birth date of his alleged second son, who this applicant claims to be, were given as "Quan Toon June, born June 25, 1922". The attorney is warranted in saying that the transcription of the testimony given by the alleged father in November, 1932, "shows no name 'June,' but gives the name of the second son, Quan Toon Jung", and it is to be regretted that this typographical error passed unnoticed.

As to the apparent difference in birth date between June 25, 1922, as set down in that memorandum statement, and May 27, 1922; the exact fact is that the alleged father spoke of his claimed second son as "Quan Toon Jung, 11 years old, born C.R. 10 or 11, 5th month, first day" and in answer to the question "Was he born in C.R. 10 or C.R. 11?" this alleged father stated, "I do not know, he is 11 years old". As Chinese calculate ages, that statement "he is 11 years old" would indicate that it was C.R. 11, or 1922, that the son in question was claimed to have been born and "C. R. 11, 5th month, first day" could be either May 27 or June 25, 1922, since there were two fifth months in that year. Again, it may be said that it is to be regretted that in giving the Western calendar interpretation of the Chinese date as given by the alleged father the two alternative dates were not both set down in this previous memorandum statement.

While the Board of Review unhesitatingly admits these unfortunate mistakes, a reference to the previous memorandum cannot fail to show that the inadvertent

S.Ct. 359, 56 L.Ed. 606; Nagle v. Wong Dock, 9 Cir., 41 F.2d 476; Wong Chow Gin v. Cahill, 9 Cir., 79 F.2d 854.

In Nagle v. Wong Dock, supra, we stated it would be unreasonable and unfair for the immigration authorities after having fully investigated the conflicting statements of the applicant as to whether or not he was married, and having determined that he was in fact married, subsequently and without additional evidence, or additional circumstances warranting a change of conclusion, to deny the admission of a second son upon the ground that the father had not in fact married the mother of the applicant.

In Wong Chow Gin v. Cahill, supra, we considered at length the effect of the previous rulings of the immigration authorities upon a subsequent application for admission.

In Jung Yen Loy v. Cahill, 9 Cir., 81 F. 2d 809, opinion by Judge Haney, the court upheld an order of exclusion upon the ground that the applicant's father was not a citizen although he has been five times admitted to the United States as a citizen. This rejection is based upon the testimony of the applicant that his paternal grandfather was Jung Wing Hong and not the American citizen, Jung Foo Wan, from whom the applicant's father claimed to have descended.

If the immigration authorities in the case at bar had ruled that the applicant's father was not a citizen and had denied him admission on that ground without additional evidence or circumstances justifying a change in their ruling it may be conceded that such action would be so unfair as to amount to the denial of due process. But the Board of Review, upon whose recommendation the secretary acted, in every instance disclaimed the right to consider anew the question of the citizenship of the alleged father, Quan Siew, and placed their denial of the right to enter upon the conclusion that the applicant was not the son of the American citizen Quan Siew. In view of the fact that the final action of the Secretary is based upon the conclusion that Quan Siew was an American citizen but that the applicant was not his son, the result must be judged from that standpoint and I think without regard to the fact that the local board improperly continues to insist upon the claim that Quan Siew was not an American citizen.

I, therefore, place my concurrence in the conclusion reached by my associates upon the ground that the immigration authorities having conceded the citizenship of Quan Siew the rejection of the evidence of both father and son that the applicant was the son of Quan Siew was so unreasonable as to amount to a denial of due process.

---

making of these mistakes had no determining importance or materiality in the substance of the Board of Review finding or in the action of the Department based thereon.

With the contention of the attorney that the original hearing of the applicant was rendered unfair because of certain statements contained in the "summary by chairman on rejection", which was written after the Board of Special Inquiry hearing had been closed and that Board's decision officially rendered, the Board of Review does not agree.

As to the new evidence presented since the case was reopened: This consists in testimony received on December 8, 1939, from one Kong Tin, an alleged acquaintance of the applicant's alleged father, who was last in China between April, 1937, and February, 1938. He has testified that prior to his departure for China in 1937 this applicant's alleged father gave him the address of his family in China and asked him, if convenient, to visit his family, and that in or about October, 1937, he did visit this alleged father's home and there had this applicant introduced to him by this alleged father's wife. On his return on February 12, 1938, however, this Kong Tin, having been sworn as to the truth of his statements, answered in the affirmative the question whether he understood that the statements he made in reply to the questions following would be used if he should testify before the Service in the future and answered in the negative the questions "Did you visit any resident of the United States who happened to be at his home in China during your recent stay, or did you visit the home of any such resident?" and "Were you introduced to the son, wife, or daughter of any resident of this country, while in China?" Certainly, it would not seem reasonable to accept testimony given in corroboration of this applicant's claim which rests wholly on the present assertion that this witness visited the alleged father's home in China and was introduced to this applicant in view of that record contradiction of the truth of this present assertion.

It is not believed that any evidence has been presented since the case was reopened which warrants a change in the outstanding decision.

It is, therefore, recommended that the order dismissing the appeal stand.