**Ex parte LEE BOCK FOOK.**

**No. 14757.**

District Court, S. D. California, Central Division.

June 16, 1941.

Y. C. Hong, of Los Angeles, Cal., for petitioner.

Wm. Fleet Palmer, U. S. Atty., and Ralph Lazarus, Deputy U. S. Atty., both of Los Angeles, Cal., for government.

HOLLZER, District Judge.

By this habeas corpus proceeding applicant seeks to have set aside an order of a Board of Special Inquiry, excluding him from admission into the United States, and which order has been affirmed by the Board of Immigration Appeals.

Applicant asserts he is the son of Lee Cheong Ot, a native of the United States and now deceased. He further contends that he is one of four children of said Lee Cheong Ot, including two older brothers named Lee Bock Hen and Lee Bock Toy,

respectively, and a twin sister of petitioner, named Lee Goot How.

The record shows that these two alleged brothers have been heretofore admitted into the United States as sons of said Lee Cheong Ot. At a hearing held in 1925, which resulted in the admission of said Lee Bock Toy, both the latter and said Lee Bock Hen testified that in 1914 their father had returned to China, where he remained until he died at the Lung Bin Village in China in March, 1916. They further testified at that hearing that they had a younger brother and sister who were twins, born in November, 1915, at Lung Bin Village, and named Lee Bock Fook and Lee Goot How respectively. The record further discloses that the alleged father departed from the United States on November 21, 1914, and so far as known, never returned to this country. Shortly prior to such departure, the latter, when applying for form 430, testified that he was married, that he had two children named Lee Bock Hin aged 10 and Lee Bock Toy aged 8, respectively, and that both of these sons were then in China.

At the hearing wherein this applicant applied for admission, said Lee Bock Toy gave testimony similar to that given by him previously, and positively identified applicant as his younger brother named Lee Bock Fook. Besides applicant and his alleged brother, Lee Bock Toy, another witness named Lee Pon Lim, an alleged fellow villager, also testified in his behalf. All of the witnesses were interrogated at considerable length. It further appeared that the alleged older brother, Lee Bock Hen had died in 1931 at South Bend, Indiana.

As stated in the memorandum opinion rendered by the Board of Special Inquiry in July, 1940, "The demeanor of all three (witnesses) before the Board was satisfactory. * * * The applicant is in fairly good agreement with testimony offered by his alleged brother and the witness in the instant case and with testimony already a matter of record in the files (SF-31784/6-15 Lee Bok Toy: SF 26751/3-14 Lee Bock Hen: SF 23463/10-20 Lee Pon Lim: SF 12017/4375 Lee Cheong Ot)"

In said file No. 31784, in the memorandum filed by the Chairman of the Board of Special Inquiry at the conclusion of the latter hearing, it is stated that said Lee Cheong Ot had been admitted as a native in 1906, at which time he claimed to have one child, a son one year old, named Lee Bock Hen; that a boy by that name had been admitted January 23, 1920, as the son of a native; also that said Lee Cheong Ot had made three trips to China, the second of which accounted for the birth of the second son named Lee Bock Toy, and that he had departed on the third trip November 21, 1914.

The evidence establishes without contradiction that on all occasions when interrogated upon the subject matter, applicant's alleged father asserted that he had only two children born prior to 1915 and further shows that both of these children have been conclusively accounted for in the persons of two sons, named Lee Bock Hen and Lee Bock Toy, who were admitted to the United States in 1920 and in 1925 respectively. The evidence likewise discloses without contradiction that said two brothers, whenever questioned concerning the same, made similar assertions, and in addition claimed to have a brother named Lee Bock Fook, and a sister and that their brother and sister were twins, born in November, 1915. Nowhere in the record, either in the evidence, or in the opinions rendered by the immigration authorities or elsewhere, is it contended that the applicant does not sufficiently resemble the admitted members of Lee Cheong Ot's family to be a member thereof. In other words, all of such evidence as is of a direct and positive character is consistent only with applicant's claim to the effect that he is a son of said Lee Cheong Ot, and that he was born in November, 1915.

In view of the foregoing evidence the question naturally arises, upon what theory was petitioner denied admission. In order to obtain a clearer understanding as to how so extraordinary a conclusion was reached, it will be enlightening to examine certain portions of the several opinions rendered in this case by the Board of Immigration Appeals. In their memorandum dated September 10, 1940, it is declared:

" * * * The statement of the Board of Special Inquiry in the summary of the evidence appears to indicate that the one real reason for that Board's excluding decision was its finding, on the evidence presented, that this appellant is considerably above the age which corresponds with his asserted birth date and of an age which would make the claimed relationship impossible.

"A person born on November 11, 1915, the asserted birth date of the appellant, would have been approximately twenty-four and one-half years of age at the time of this appellant's examination. The members of the Board of Special Inquiry have expressed their several opinions that the appellant is at least four or five years above that age. Dr. E. C. Kading has submitted a statement of his reasons for finding that the appellant is approximately thirty-five years old. His finding was based in part upon his own superficial examination of the appellant's physical development and in part also on the conclusion of the Roentgenologist, Dr. Albert Allen, that the X-ray examination of the appellant's skeletal development shows his probable age to be 'well over thirty-five years'. Drs. J. J. Burby and Thomas A. Wong, physicians in private practice employed by those interested in the appellant's cause, in testimony before the Board of Special Inquiry, stated in effect that they found that the appellant might be of approximately the age which corresponds with his asserted birth date. However, Dr. Burby admitted that the authorities relied on by the Government Roentgenologist in his interpretation of the X-ray showings are 'completely unknown' to him, and Dr. Wong disclaimed any special competence as a roentgenologist.

"In the circumstances, it is believed that the Board of Special Inquiry was warranted in its finding that the weight of the evidence presented establishes that the appellant is of an age which would make unreasonable a finding that his claim to be a son of his alleged father has been satisfactorily established."

The expert testimony given by the government witnesses, and referred to in the foregoing opinion, was to the effect that the suture closures found in applicant's skull could not have taken place until after he had attained the age of at least 30 or perhaps 35, or even 40 years. From this evidence the Board of Special Inquiry concluded that applicant was much older than he claimed to be and therefore could not be the son of Lee Cheong Ot.

The record further discloses that about ten days after the foregoing opinion was rendered, the case was reopened "for the purpose of considering whatever additional evidence may be presented by Dr. John J. Burby bearing upon the question of applicant's age and whatever comment may be made upon this evidence by representatives of the United States Public Health Service."

Such further hearing was held on October 3, 1940, at which time Dr. Burby, appearing on behalf of applicant gave further testimony and in addition produced a Miss Mildred Brunette and her mother, who also testified. This additional evidence, including X-ray films taken of Miss Brunette's skull, disclosed, in contradiction to the testimony given by the experts produced on behalf of the Immigration Department, that the skull of Miss Brunette, who was born December 3, 1923, at Santa Barbara California, showed suture closures virtually identical to those existing in applicant's skull.

Following this second hearing a copy of the testimony taken thereat, together with all the exhibits, was forwarded to Dr. Kading, one of the government experts, for his review. Thereafter, upon receiving the latter's report commenting on said testimony, the Board of Special Inquiry again entered an order excluding said applicant.

*However, when this second decision reached the Board of Immigration Appeals, the latter, upon its own motion, ordered that the case be again reopened for further investigation, which should include affording opportunity for the consideration of whatever comments might be made by Dr. Allen upon the evidence as to the age of the applicant which had been presented by Dr. Burby.* (Emphasis ours.) In connection with said order, the Board filed a memorandum wherein it was declared:

"As stated in the memorandum of September 20, 1940, '*inasmuch as the one substantial reason for the exclusion in this case is the alleged age discrepancy, which appears to rest upon the question as to the time of normal closure of these skull sutures, it is believed that fairness requires that the additional evidence which is now proposed to be offered by Dr. Burby and comments upon this evidence by the roentgenologist employed by the Public Health Service should be given consideration.*'

"However, through inadvertence the order of reopening did not specifically mention Dr. Albert Allen, the Roentgenologist employed by the Public Health Service, as the person whose comments upon the evidence presented by Dr. Burby should be given consideration, and after reading the evidence presented by the Roentgenologist,

Dr. Burby, only the comments of Dr. E. C. Kading, representing the Public Health Service, were requested and received. *Dr. Kading disclaims expert qualification as a roentgenologist. In the circumstances, it is believed that the reopening order should be corrected or amended definitely to express the Board of Immigration Appeals' intention as set forth in the memorandum of September 20, 1940."* (Emphasis ours.)

Such third hearing was held on December 31, 1940, at which time the requested report from Dr. Allen was admitted in evidence. In the latter report, Dr. Allen in substance asserted that he held to the same opinion he had originally given. Thereupon the Board of Special Inquiry rendered its decision to the effect that the Board likewise had not changed its mind, and accordingly again ordered the applicant excluded.

As indicated from the previously quoted excerpts taken from the several opinions filed by the Board of Immigration Appeals, the testimony given by the medical experts is in conflict, to say the least. Indeed, an analysis of the same fairly discloses that the two experts called on behalf of the immigration authorities do not themselves agree in a number of particulars. Likewise, their testimony demonstrates that there is a considerable age variance at which skull sutures close.

Thus the only evidence upon which the immigration authorities rely to support the order of exclusion is neither direct nor positive. On the contrary, such proof is confined solely to expert testimony, consisting primarily of varying theories, respecting which neither the government witnesses, nor the text writers to whom they referred, are wholly in accord. Furthermore, the living exemplar produced by applicant's medical experts presents a flat contradiction of the theories advanced by the government's witnesses. While it is true that one of the latter undertook to explain away this exceedingly convincing proof which virtually demonstrated that these theories were hardly applicable to the applicant, by asserting that sometimes skull sutures close prematurely, and some-

times these are closed at birth, and that hence this living exemplar might be an exception to the so-called general rule, the fact remains that no satisfactory explanation was given by that expert as to why it would not be equally correct to conclude that either the sutures in applicant's skull had closed prematurely, or that he had been born that way.

Finally, we think it to be of more than passing significance that two of the members of the Board of Special Inquiry which sat at the first hearing did not attend either the second hearing or the third hearing. Granting that we may assume that the officials who replaced these two original members of the Board reviewed the record of what had theretofore transpired, nevertheless it can not be denied that the substitute members did not hear the applicant or his alleged brother Lee Bock Toy or the fellow villager Lee Pon Lim testify and hence they were hardly qualified to pass on the credibility of those witnesses or the weight to be given to their testimony. This circumstance, also the haste and the eagerness with which the Board of Special Inquiry, following the close of the second hearing, brushed aside the persuasive evidence presented thereat on behalf of the applicant, without even waiting for at least an ex parte report from the only government witness, who, as the Board of Appeals later pointed out, was qualified to render an expert opinion upon such evidence, coupled with the superficial consideration given to the direct and positive evidence which without conflict establishes that applicant is a son of Lee Cheong Ot, a native and now deceased, lead to but one conclusion, namely, that the Board of Special Inquiry, in effect disregarded the evidence presented on behalf of applicant and that such action was manifestly unfair.

Accordingly, upon the authority of Carmichael v. Wong Choon Ock, 119 F.2d 173, and Quan Toon Jung v. Bonham, 119 F.2d 915, decided April 19, 1941, and May 19, 1941, respectively, by our Ninth Circuit Court of Appeals, we hold that applicant is entitled to be discharged from custody.